FILED
2012 Sep-27  PM 01:33
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **RYAN A. FINKLEY**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **5:11-CV-1306-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I.  Introduction

On January 23, 2007, the claimant, Ryan Finkley, applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act, respectively.  The claimant alleges disability commencing on August 15, 2006.  On April 12, 2007, the Commissioner denied the application.  The claimant timely requested a hearing before an Administrative Law Judge, and the ALJ held a video hearing on January 27, 2009.  In a decision dated February 24, 2009, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, was ineligible for disability insurance benefits and supplemental security income.  On Febrary 15, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R.1).  The claimant has exhausted his

administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. Issues Presented

The claimant presents the following issues for review:

1)   whether the ALJ properly discredited the opinion of the treating physician, Dr. Roberts, when the ALJ concluded that the medical evidence did not support the doctor's opinion;

2)   whether the ALJ correctly applied the Eleventh Circuit's three-part pain standard when he determined that the evidence did not support the severity of the claimant's pain; and

3)   whether the ALJ properly determined the claimant's residual functional capacity when he incorporated only minor limitations because of the claimant's pulmonary problems and did not include limitations relating to the claimant's kidney condition.

## III. Standard of Review

The standard of review of the Commissioner's decision is a limited one.  This court must affirm the Commissioner's decision if he applied the correct legal standard and if substantial evidence supports his factual conclusions.  42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).  "[The Court must]. . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's]. . .

2

factual findings. . . No similar presumption of validity attaches to the [Commissioner's]. . . legal

conclusions, including determination of the proper standards to be applied in evaluating claims."

*Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987).

### IV.  Legal Standard

Under 42 U.S.C. § 423(d)(1)(A), "a person is entitled to disability benefits when the

person is unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can last for a continuous period of not less than 12 months. . . . "

To make this determination the Commissioner employs a five-step, sequential evaluation

process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[1]

The ALJ must give the treating physician's testimony substantial or considerable weight,

unless "good cause" is provided.  *Crawford v. Commissioner,* 363 F.3d 1155, 1159 (11th Cir.

2004); *see also Lewis v. Callahan,* 125 F.3 1436, 1440 (11th Cir. 1997).  "'Good cause' exists

---

[1]*McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income
case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title
II are appropriately cited as authority in Title XVI cases.  *See, e.g., Ware v. Schweiker*, 651 F.2d
408 (5th Cir. 1981) (Unit A).

3

when the: [sic] 1) treating physician's opinion is not bolstered by the evidence; 2) evidence supported a contrary finding; or 3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). An ALJ must re-contact medical sources only when the evidence received from the source is inadequate to determine a claimant's disability. 20 C.F.R. §§ 404.1512(e), 416.912(e); *Gallina v. Comm. of Social Sec.*, 202 Fed. Appx. 387, 388 (11th Cir. 2006).

To establish disability through subjective testimony, the claimant must satisfy the three-part "pain standard." The pain standard requires "1) evidence of an underlying medical condition and 2) either (a) that objective medical evidence confirming the severity of the alleged pain, or (b) that the objectively determined medical condition could reasonably give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support the finding of a disability." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).

In making his RFC assessment, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." SSR 96-8p, 61 Fed. Reg. 34, 474 (July 2, 1996). If nonexertional impairments exist, the ALJ must introduce independent evidence, preferably through a vocational expert's testimony, of existence of jobs in the national economy that the claimant can perform. *Wolfe v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996). For a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *Vega v. Comm. of Social Security*, 265 F.3d 1214, 1220 (11th Cir. 2001). The ALJ is not required to include findings in the hypothetical that the ALJ has found to

be unsupported by the record.  *Crawford*, 363 F.3d at 1161.

### V. Statement of Facts

At the time of the administrative hearing the claimant was twenty-seven years old and had a twelfth grade education.  He previously worked as a cook at a local seafood restaurant for a month in August 2006 and had worked in a factory before being laid off.  According to claimant, he suffers from pulmonary fibrosis, breathing attacks, severe left kidney pain, and chronic fatigue. (R. 20).  Since August 15, 2006, the claimant has not engaged in substantial gainful activity. (R. 122).

*Physical Impairments*

 On June 28, 2006, Dr. Mark Roberts, an internist at Evergreen Hospital and the claimant's primary care physician, treated the claimant for a cough, runny nose, pain in his chest, and nausea.  Dr. Roberts referred the claimant to Dr. Joseph L. Ameh, with Pulmonary & Critical Care.

On August 6, 2006, the claimant had a chest X-ray read by radiologist Dr. Jeffrey Brandon.  The X-ray showed numerous fibronodular densities throughout the lungs, but could not rule out pneumonia without prior films for comparison.  The X-rays also showed that the claimant's heart was not enlarged and his bones were grossly intact.  (R. 198)

On August 10, 2006, Dr. Ameh treated the claimant for a chronic cough and examined the X-rays that the claimant brought with him from August 6, 2006.  Dr. Ameh found that the claimant had scarring in both lung fields and was likely suffering from pulmonary fibrosis, rhinitis, and asthma.  The records indicated that the claimant treated his wheezing and shortness of breath with Montelukast and Albuterol inhalers.  Dr. Ameh prescribed Advair in addition to

5

the claimant's other medications.  (R. 199-200).

On August 29, 2006, Dr. Roberts ordered a CT scan of the claimant's chest.  (R. 184).
Dr. Stephen Teplick performed the CT on September 1, 2006 that indicated nodular and
interstitial lung disease, as a well as hydronephrosis of the left kidney. (R. 196-97).

On December 5, 2006, Dr. Roberts treated the claimant for a cold, cough, congestion, and
pain when coughing.  Dr. Roberts' records indicate that the claimant suffered from Asthma;
Interstitial Nodular Disease; and chronic cough and referred the claimant to Dr. John N.
McAtnee, a pulmonary care specialist. (R. 183-84).

On January 3, 2007, Dr. McAtnee ordered another CT scan of the claimant's chest.  On
January 5, 2007, the claimant underwent a CT scan of the chest, abdomen, and pelvis without
contrast that showed a large left kidney with presumed hydronephrosis.  The radiologist, Dr.
Maragret Mowry, recommended an additional CT scan with contrast that the claimant underwent
that same day.  The CT scan with contract indicated a severe hydronephrosis and enlargement of
the left kidney. (R. 194-95).  The claimant had an emergency pyeloplasty surgery performed at
Urology Clinic, LLC on January 8, 2007  to install a stent and to drain his left kidney.  The
claimant reported little or no pain, and all tests indicated normal results during his followup visit
a week later on January 16, 2007. (R. 181, 204-05).  On January 18, 2007, Dr. Roberts examined
the claimant; during the visit, the claimant told the doctor that he needed to go back to work. (R.
181).

On Februray 13, 2007, the claimant returned to the Urology Clinic and had the stents
removed.  The claimant reported some severe pain to the attending physician, but the pain was
not in the kidney area or where the surgery had been performed.  To assess the pain, the claimant

6

underwent an ultrasound that showed his right kidney to be a normal shape and size with no evidence of any pathology. The Urology Clinic's physician ordered the claimant to light duty restrictions for one month with a followup exam in six months.

Sometime after February 9, 2007, the claimant, at the request of the Disability Determination Service (DDS), submitted a fatigue questionnaire indicating that he prepares or cooks his own meals; that he can do laundry and fold clothes; that plays games on the television; that he leaves the house two to three times per week; that he visits other people, attends church and goes to the store. (R. 140-42).

On February 14, 2007, the claimant presented to the Evergreen Medical Center emergency room complaining of pain in his left side, but was released that same day in good condition. Later that day, the claimant returned to the Urology Clinic again complaining of pain in the left side. An examination revealed pain in the area of the left pelvic point, but no pain on percussion on both sides. An ultrasound of the left kidney revealed a smaller left kidney than before the surgery and no suspicious calcifications. The physician prescribed Lortab for the claimant's pain; suggested he see his medical doctor to evaluate the pain; and advised him to return in six months for a followup. No evidence exists in the record that the claimant went to his followup exam. (R. 202-03).

On April 10, 2007, Dr. Roberts wrote the following short letter "To Whom It May Concern" regarding the claimant's ability to work:

> The above listed patient has been under my care. He has been
> diagnosed with a medical condition that will not allow him to work
> at this time. The duration of the condition is indefinite until further
> notice. Patient has been referred to a specialist for further evaluation
> and treatment of his medical condition. . . .

(R. 209).  The record does not include at whose request Dr. Roberts wrote this letter.

On April 11, 2007, at the DDS request, the Monroe County Hospital conducted consultative pulmonary tests on the claimant.  J. Sailors, R.R.T., conducted the test and noted that the claimant had no wheezing or cough, but was uncooperative.   The therapist further stated that the claimant gave a "very poor effort," and in the therapist's opinion, the claimant intentionally tried to affect the tests results.  The tests demonstrated that the claimant had an adequate force vital capacity, the maximum amount of air that a person can expel, but that the claimant refused to finish the test. (R. 211).

On April 12, 2007, Hayward Shula, a disability specialist with the DDS, prepared the claimant's physical residual functional capacity assessment.  The RFC assessment noted the claimant's prior diagnoses for asthma, linear nodular interstitial disease, and ureteropelvic junction stenosis, but also noted that the claimant had been uncooperative during his pulmonary tests at Monroe County Hospital.  The disability specialist found few limitations on the claimant's ability to lift, sit, or push and pull.  The DDS's assessment showed no postural, manipulative, communicative, or visual limitations.  However, the DDS's assessment found that the claimant should avoid concentrated exposure to fumes, odors, gases, dust, and poorly ventilated areas.  (R. 220-23).

The claimant has sought intermittent treatment since his kidney surgery on January 8, 2007.  The claimant sought treatment on August 14, 2007 at Evergreen Medical Center, complaining of right groin pain.  Records for this visit indicate the claimant smoked a half pack of cigarettes a day.  (R. 233)  On November 23, 2007, the claimant sought emergency treatment

8

at Crestwood Medical Center for shortness of breath, groin pain, and nocturnal dyspnea. Diagnostic tests showed hydronephrosis of the left kidney, but no tenderness, abdominal pain, or any indication of urinary tract stones.  (R. 246-65).  The claimant presented to the Crestwood Medical Center on December 3, 2007 complaining of moderate shortness of breath; pain on inspiration; and a cough.  The records for this visit indicate the claimant had no acute distress; had a soft, non-tender abdomen; had not taken his medication in two days yet only complained of moderate respiratory distress; and had an improved condition after a bronchodilator treatment. (R. 246-52). The claimant sought emergency treatment again in January, March, July, and September of 2008 for wheezing, shortness of breath, and chest pains, but only claimed to have mild abdominal tenderness or pain around the kidney areas. (R. 244-338).  During these emergency room visits, the claimant's lungs were clear, and he had no acute respiratory distress, despite not filling his prescriptions for medications (R. 209).  The records indicate that the claimant admitted that "he usually gets better with Albuterol" but did not try his Albutorol on that day (R.275); that his medication relieves his pain (R. 279); and that he has some relief from his symptoms when using his wife's asthma machine (R. 309).

*ALJ Hearing*

The Commissioner denied the claimant's request for supplemental security income and disability insurance benefits on April 12, 2007.  The claimant filed a written request for a hearing, and the ALJ held a video hearing on January 27, 2009. (R. 15).  The claimant testified that he had not worked since August 15, 2006, when he worked as a cook for Davis Catfish.  The claimant explained that he stopped working after a month because he could not handle the fast pace and the constant moving would induce asthmatic attacks.  The claimant testified to having

9

worked and been laid off from a job as a quality control inspector in a factory, but would not

return to the work if given the opportunity, because of the required exposure to metallic dust.

The claimant stated that he has not worked because his doctor told him not to work and that his

breathing problems prevent him from working.  When asked whether he had looked for a job that

would allow him to work indoors, the claimant stated he had not done so in a long time. (R. 55-

58).

      The claimant testified that he does not drive a car and did not have a license at the time of

the hearing. The claimant explained that his license had been revoked because of his failure to

appear for traffic offenses, and that he had a bench warrant issued for his arrest at the time of the

hearing.  The claimant maintained that he does no household chores and mostly watches

television during the day, but he can dress and bathe himself. (R. 57-59).

      When his attorney questioned him, the claimant stated that he can sit for 20 minutes at a

time and stand for only 15 minutes at time.  Furthermore, he gets short of breath if he walks more

than a fourth of a block, and especially gets short of breath if he physically exerts himself, i.e.

exercising, or is around dust, fumes, or other chemicals.  The claimant further claimed that the

weather has a detrimental effect on his breathing ability and that he also suffers from chronic

fatigue, requiring him to frequently sit and rest.  (R. 61-62).

      The claimant asserted that his kidney surgery in early 2007 did not completely alleviate

his kidney problems, and that because of repeated enlargement of his left kidney, he would need

to have a second surgery.  The claimant maintained that he often feels severe pain in his left side

two to three days a week, but limited finances and lack of health insurance have left him unable

to afford a second surgery. (R. 63-64).

The claimant then testified about his breathing problems.  The claimant stated that he has breathing attacks during the night, which cause him to lose sleep.  He noted that he also experiences attacks if he gets excited or physically exerts himself.  The claimant testified that inhaler medication has been the primary treatment, as well as occasional trips to the emergency room.  The claimant further claimed that the medications sometimes cause vomiting and diarrhea.  However, the claimant did admit to smoking cigarettes, but stated he had weaned himself down over the previous year from a pack a day to one cigarette per day.  The claimant did not specify how long he had cut down his smoking to one cigarette per day.  (R. 64-68).

Lastly, the ALJ asked the claimant if he could perform a job inside that only required sitting and standing whenever he wanted and viewing a video monitor for shoplifters.  The claimant responded that he "probably could" perform the job.  (R. 73).

A vocational expert, Barbara Azzam, testified to the availability of jobs that the claimant could perform. (R. 69-80.)  Ms. Azzam listed the claimant's past relevant work experience as a stock clerk and an inspector.  She did not include the claimant's work as a cook, because the claimant had not performed the job long enough for it to qualify as relevant work experience.  Ms. Azzam categorized the stock clerk position as medium, semi-skilled labor and the inspector job as light, semi-skilled labor.  The ALJ asked Ms. Azzam whether a person of the same age, education, prior work experience, and training as the claimant could perform the claimant's past relevant work if a person had no limitation on his arm control ability; had no postural, manipulative, visual, or communicative limitations; and had the ability to frequently lift and carry up to 25 pounds; had the ability to occasionally lift, carry, or pull up to 50 pounds one-third of the day; had the ability to stand or walk with normal breaks for six hours per day; but had to

11

avoid concentrated exposure to fumes, odors, dust, gas, and poor ventilation.  Ms. Azzam stated

that the person could not work as an inspector because of the limitation on exposures to odors,

dust, and fumes.  However, she noted that the claimant could work as a stock clerk.

Additionally, Ms. Azzam determined that other jobs exist in significant numbers in the national

economy that the claimant could perform, such as a hand packager and a production helper. (R.

71-75).

   The ALJ posed a second hypothetical to Ms. Azzam that included having to miss one day

of work per month because of breathing problems; having the same age, education, work

experience, and training as the claimant; having the ability to occasionally lift, carry, and pull up

to 20 pounds and to frequently lift, carry, and pull up to 10 pounds; having no limitations on the

ability to sit during the day; having the ability to stand at least six hours a day and to walk no

more than an hour each day; having no limitations on pushing or pulling hand controls; having

no communicative, manipulative, or visual limitations; having no requirements to climb ladders

or ropes and only requiring occasional ramp and stair climbing; having no exposure to dust,

fumes, odors, gasses or poorly ventilated areas; and having no driving requirement.  The ALJ

placed further limitations that included only low stress jobs involving simple routine task and

work related decisions; involving only occasional contact with the public; and requiring inside

work away from temperature extremes and excessive humidity.  Ms. Azzam stated that those

limitations would preclude a person from performing all of the claimant's past relevant work,

because of the lifting restrictions and the required avoidance of dust, fumes, and odors.

However, Ms. Azzam did testify that jobs exist in significant numbers in  the national economy

that a person, with those limitations, could perform, such as a bagger or a ticket marker. (R. 76-

78).

The claimant's attorney asked Ms. Azzam whether a person that visited the emergency

room, like the claimant, and required one or two day hospital admissions seven to ten times a

year could perform any of the claimant's relevant past work.  Ms. Azzam stated that because of

the large number of absences required, the claimant could not perform his past relevant work.

Lastly, he inquired whether a person could perform work if that person required lying down three

to four times a days because of breathing and kidney problems.  Ms. Azzam maintained that no

one could perform the claimant's relevant past work or any other work under those limitations.

(R. 79-80).

<em>ALJ's Decision</em>

On February 24, 2009, the ALJ issued a decision finding that the claimant was not

disabled under the Social Security Act.  The ALJ first found that the claimant met the Social

Security Act's insured status requirements.  Secondly, he found that the claimant had not

engaged in substantial gainful activity since August 15, 2006.  The ALJ further found the

claimant had the following severe impairments: asthma and pulmonary fibrosis.  The ALJ found

that none of the impairments either singly or in combination met or medically equaled those in

the Listing of Impairments.  The ALJ found that the claimant's kidney problems did not result in

a limitation to do basic work activities; therefore, those impairments were non-severe. (R.17-19).

The ALJ addressed the claimant's kidney problems and related pain.  The ALJ made his

determination on several factors.  First, the ALJ acknowledged that the claimant had little or no

pain following the pyeloplasty surgery, and any pain that the claimant did feel was not related to

the surgery area. (R. 202-05).  Second, the claimant did not attend any followup visits to his

13

urologist or Dr. Roberts, his primary care physician, during the two years following the surgery.

When the claimant has sought treatment, his treatment has been conducted in emergency rooms

on an infrequent basis, and for matters unrelated to his kidney condition.  Furthermore, a CT

exam conducted in November 2007 showed evidence of hydronephrosis.  However, the ALJ

noted that the claimant has not sought treatment for the condition. (R. 253-65).  Moreover, the

records of the claimant's visits to emergency rooms in 2008 indicated that he felt little or no

abdomenal pain or kidney pain. (R. 267-338).  Lastly, the ALJ did not find credible the

claimant's testimony of feeling severe pain two to three days per week because of kidney pain,

citing the claimant's lack of any pain medication use, either prescribed or over-the-counter. (R.

160, 174, 276, 327).

   The ALJ determined that the claimant, because of lifting restrictions and pulmonary

irritant restrictions, could not perform any past relevant work.  However, the ALJ found that the

claimant's residual functional capacity showed that the claimant could perform light, unskilled

jobs, such as a bagger or as a ticket marker. (R. 25).

   The ALJ concluded that the claimant did have medically determinable impairments that

could be reasonably expected to cause the alleged symptoms; but the objective medical evidence

did not support the claimant's testimony to the severity of his impairments or Dr. Robert's letter

of April 10, 2007 indicating that the claimant could not work.  First, the ALJ recognized that the

objective medical evidence indicates that the claimant does suffer from chronic interstitial

pulmonary disease.  However, the claimant had been treated with only inhalers and had not

visited his pulmonary specialist in two years, indicating that his condition is not as severe as he

claimed.  Furthermore, the ALJ acknowledged that the claimant's respiratory problems were

14

mostly alleviated or non-existent when the claimant properly utilized his inhaler and other medications. (R. 23-24).

Next, the ALJ cited the claimant's noncompliance with his medications and continued smoking as further evidence that the claimant's breathing problems were not severely limiting. Although the claimant stated at the hearing that he had reduced his smoking to one cigarette per day, the ALJ did not find the claimaint's statement credible. The ALJ explained that no objective evidence confirms the claimant's statement and that treatment records from 2006, 2007, and 2008 showed that the claimant continued to smoke, as much as one half pack per day. (R. 205, 233, 240, 246, 256, 267). The ALJ further cited the following reasons to show that the claimant's testimony was inconsistent with the evidence and to find the claimant capable of light work:  the claimant's nondisclosure and lack of testimony regarding numerous employers that appeared on his work history report; his daily activities on the 2007 questionnaire that were consistent with light work; his lack of any muscle atrophy, motor or sensory loss; his lack of oxygen supplementation; his lack of any medical treatment for long periods of time; his inconsistent statements regarding alcohol consumption; the claimant's lack of any statements from any physician other than Dr. Roberts stating that he could not work because of his pulmonary condition; the pulmonary function studies that indicated good results; his failure to cooperate with the DDS's pulmonary test; and his bench warrant for failing to appear for a traffic offense of driving without a license and speeding. (R. 22-24).

The ALJ gave little weight to the claimant's treating physician Dr. Roberts's opinion, stated in the letter of April 10, 2007, because his opinion did not assess the severity or nature of the claimant's impairments and did not state the specific medical condition or medical tests that

he relied on to determine that the claimant could not work.  Moreover, the ALJ explained that Dr. Robert's opinion conflicts with the rest of the evidence in the record that shows that the claimant has not sought medical attention frequently and that his pulmonary tests were normal until he refused further testing. (R. 23-24).

Lastly, the ALJ gave little weight to the opinion of the state agency disability specialist, Mr. Shula.  Because medical opinions must come from licensed medical professionals, the ALJ explained that the disability specialist's opinion is not an acceptable medical opinion according to 20 C.F.R. §§ 404.1513 and 416.913.  Furthermore, the ALJ found that the DDS's physical residual functional capacity assessment conflicted with later medical evidence obtained that demonstrated the claimant's symptoms were more severe than the DDS initially assessed (R. 23).

## VI.  Discussion

### I.  Whether the ALJ properly discredited the treating physician Dr. Roberts's opinion when the ALJ concluded that the medical evidence did not support the doctor's opinion.

The claimant asserts that the ALJ improperly discredited the testimony of the treating physician, Dr. Roberts.  The claimant states that the ALJ should have afforded Dr. Roberts's opinion significant weight and that the ALJ should have re-contacted Dr. Roberts if the ALJ found any insufficiency in his opinion.  The ALJ provided good cause and adequately expressed his reasons for according little weight to Dr. Roberts's opinion.  Moreover, the court finds that the ALJ had no responsibility to re-contact Dr. Roberts.

The ALJ must accord treating physicians' opinions substantial or considerable weight, *unless* the ALJ shows good cause for discrediting the opinion.  *Crawford*, 363 F.3d at 1159 (emphasis added).  The ALJ has good cause to discredit a treating physician if  the evidence in

16

the record does not support his opinion; if the evidence in the record justifies a different finding; or opinion of the treating physician is "conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1240-41.  If the ALJ articulates specific reasons for giving the treating physician's opinion less than controlling weight and substantial evidence supports those reasons, then the ALJ commits no reversible error.  *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).  The ALJ may reject any medical opinion if the evidence supports a different finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

The ALJ expressly articulated the reasons for discounting Dr. Roberts's letter of April 10, 2007 stating that the claimant is precluded from work indefinitely. The ALJ found that Dr. Roberts's opinion did not specifically state or identify the condition that prevents the claimant from working.  The ALJ also noted that Dr. Roberts failed to state the expected duration of the condition and failed to identify any clinical tests on which he relied to form his opinion. Furthermore, the ALJ noted that Dr. Roberts did not have access to or the benefit of comparing his findings to the other medical findings in the record.  Therefore, Dr. Roberts did not have the ability to revise or update his medical opinion in light of more recent medical examinations that found the claimant's impairments less severe, resulting in Dr. Roberts's opinion conflicting with the later medical evidence.  Because the ALJ explained that Dr. Roberts's opinion conflicted with the rest of the medical evidence, the ALJ appropriately rejected the treating physician's opinion.

The claimant further argues that the ALJ had a duty to contact Dr. Roberts to clarify any insufficiencies in the record.  Although in some situations an ALJ may be required to re-contact medical sources, the ALJ did not have that duty in the present case.  An ALJ must re-contact

17

medical sources only when the evidence received from the source is inadequate to determine a claimant's disability.  *See* 20 C.F.R. §§ 404.1512(e), 416.912(e); *Gallina v. Comm. of Social Sec.*, 202 Fed. Appx. 387, 388 (11th Cir. 2006).

Here, Dr. Roberts's opinion, although it did not specifically state the severity or duration of the claimant's disability, did state that the claimant was unable to work due to a medical condition.  However, because other medical and non-medical evidence in the record contradicted Dr. Roberts's opinion and indicated that the claimant does have the ability to perform light work, the ALJ had no duty to seek further evidence or clarification from Dr. Roberts.  This court finds that the ALJ followed the proper legal standard and that substantial evidence exists for his findings.

## II.     Whether the ALJ correctly applied the Eleventh Circuit's three-part pain standard when he determined that the evidence did not support the severity of the claimant's pain.

The claimant asserts that the ALJ improperly rejected the claimant's pain testimony.  However, the ALJ properly applied the pain standard when he discredited the claimant's subjective pain testimony.  Because the ALJ properly applied the pain standard, no requirement existed to make his determinations based on the claimant's subjective pain allegations and substantial evidence exists to support his findings.

The pain standard requires that the claimant presents evidence of an underlying medical condition, *and either* that objective medical evidence exists confirming the pain the condition causes or that the objectively determined medical condition is severe enough that it can be reasonably expected to cause the alleged pain.  *Wilson*, 284 F.3d at 1225.  If the record does not show that the ALJ properly applied the three-part standard, this court must reverse the ALJ's

decision. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ decides not to credit the claimant's testimony, he must discredit it explicitly and articulate explicit and adequate reasons for doing so; failing to do so requires that the testimony be accepted as true. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).

Here, the ALJ determined that the claimant did have medically determinable conditions that could reasonably be expected to cause the symptoms that the claimant alleged in his disability application and testimony. However, the ALJ identified several factors that indicated that the claimant's conditions were not as severe as he claimed. First, in relation to the claimant's kidney condition and pain, the ALJ found that the claimant did not mention taking any type of pain medication, either prescribed or over-the-counter, despite claiming to suffer from severe pain two to three days each week. Moreover, the ALJ cited the claimant's medical records from November 2007 to November 2008, where the claimant sought emergency treatment on six occasions, to discredit the claimant's testimony. The records show that the claimant did not allege or complain of any pain arising from his kidney condition or around the abdominal region at any of the emergency visits. Finally, the claimant did not allege that his disability arose from the pain caused by his kidney condition in either his DDS fatigue questionnaire or the daily living activities form. The ALJ had no requirement to give significant weight to the claimant's pain testimony, because the ALJ adequately and expressly articulated his reasons for discrediting that testimony.

Next, the ALJ discredited the severity of the claimant's pulmonary and breathing conditions. First, the ALJ noted that the claimant has been treated conservatively for his condition and that the use of inhalers, when used properly, largely alleviates the claimant's

19

symptoms.  Furthermore, the medical records indicate that the claimant's breathing attacks occur primarily because he is noncompliant with his medication or does not use his medication properly.  Moreover, the claimant did not return to his pulmonary specialist in the two years since his disability application.  The ALJ cites that, although the claimant asserts irritants stimulate his breathing problems, the claimant still smokes cigarettes, further discrediting the alleged severity of his condition.  Lastly, the ALJ cited, as a basis to further discredit the severity of the claimant's condition, the report from the DDS that indicated that the claimant performed reasonably well on his pulmonary tests before attempting to affect the results and becoming uncooperative.  This court finds that the ALJ appropriately applied the three-part pain standard to discredit the claimant's subjective testimony regarding the severity of his pain, and substantial evidence supports his decision.

**III.    Whether the ALJ properly determined the claimant's residual functional capacity when he incorporated only minor limitations because of the claimant's pulmonary problems and did not include limitations relating to the claimant's kidney condition.**

The claimant contends that the ALJ's RFC assessment is flawed and maintains that the ALJ should have included limitations in his RFC finding based on the severity of the claimant's alleged pulmonary condition and the alleged pain severity arising from the claimant's kidney condition.  Because the ALJ properly discredited the severity of the claimant's conditions, through both medical and non-medical evidence, and explicitly articulated his reasons, the ALJ did not have to consider limitations based on the claimant's allegations of pain or symptom severity in assessing the claimant's RFC.

"Limitations or restrictions that affect the ability to work other than sitting, standing, walking, lifting, carrying, pushing, or pulling are considered nonexertional."  20 C.F.R. §§

20

404.1569a(a), 416.969a(a).  The ALJ must provide independent evidence that jobs exist in the national economy that the claimant can perform through vocational expert testimony if nonexertional limitations exist.  *Wolfe*, 86 F.3d at 1077-78.  The ALJ must pose hypothetical questions that include all of the claimant's impairments for a vocational expert's testimony to constitute substantial evidence.  *Vega*, 265 F.3d at 1220.  However, the ALJ is not required to include any unsupported findings in the hypothetical. *See Crawford*, 363 F.3d at 1161.

The ALJ posed hypothetical questions to the vocational expert that fully encompassed *all* of the claimant's *supported* impairments and included these supported limitations in his RFC assessment that the claimant could perform light work with limitations.  Specifically, in both the hypothetical to the vocational expert and the ALJ's RFC assessment, he limited the claimant to only jobs that did not require exposure to temperature extremes, excessive humidity, or air borne irritants to address the claimant's breathing problems.  The ALJ further included physical limitations that would prevent the claimant from having to exert himself or cause breathing attacks, such as only requiring occasional lifting, pulling, or pushing small amounts of weight and the ability to occasionally climb stairs or ramps.  Furthermore, when the ALJ directly asked the claimant if he thought he could perform a job where his only task was to view video monitors, the claimant replied that he thought he probably could perform the work.  Because the ALJ included limitations in the hypotheticals and in his RFC assessment that were based on the claimant's medically supported impairments, the ALJ properly assessed the claimant's residual functional capacity, and substantial evidence supports his findings.

## VII.  Conclusion

For the above reasons, this court concludes that the decision of the Commissioner is

21

supported by substantial evidence and is AFFIRMED.  The court will enter a separate order to

that effect simultaneously.

DONE and ORDERED this 27th day of September, 2012

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE